1  EILEEN M. DECKER
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   DAVID M. HERZOG (Cal. Bar No. 224594)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5       1300 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0600
7       Facsimile: (213) 894-3713
        E-mail:   david.herzog@usdoj.gov
8
   Attorneys for Applicant
9  UNITED STATES OF AMERICA

10            UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  In the Matter of the Search of      No. M-16-00697
    Two Subject Accounts, maintained
13  at:                                 GOVERNMENT'S *EX PARTE* APPLICATION
    Facebook, Inc.                      FOR FIRST EXTENSION OF TIME WITHIN
14  1601 Willow Road                    WHICH TO RETAIN AND SEARCH SOCIAL
    Menlo Park, California 94025        MEDIA ACCOUNTS; DECLARATION OF
15                                      MICHAEL S. BROWN

16                                      **(UNDER SEAL)**

17

18       The United States of America, by and through its counsel of

19  record, Assistant United States Attorney David M. Herzog, hereby

20  applies for an under seal order extending by 120 days the time within

21  which the government may retain and search two social media accounts

22  seized pursuant to a federal search warrant.

23  //

24  //

25  //

26  //

27  //

28  //

1     This application is based on the attached declaration of Special

2 Agent Michael S. Brown and the files and records of this case,

3 including the underlying search warrant and affidavit in support

4 thereof.

5 Dated: June 21, 2016          Respectfully submitted,

6                              EILEEN M. DECKER
                             United States Attorney

7

8                              LAWRENCE S. MIDDLETON
                             Assistant United States Attorney
                             Chief, Criminal Division

9

10

11                              DAVID M. HERZOG
                             Assistant United States Attorney

12                              Attorneys for Applicant
                             UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MICHAEL S. BROWN

I, Michael S. Brown, hereby declare and state:

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since October 2006. Since February 2016, I have been assigned to a Civil Rights squad at the Los Angeles Field Office of the FBI, which conducts investigations into Human Trafficking activity.  I am primarily assigned to conduct investigations of sex and labor trafficking by means of force, fraud, or coercion, as well as the conspiracies associated with these offenses, in violation of United States Code, Title 18, Sections 1589, 1590, 1591, 1592, 1593, 1594, and 2421. From 2007 to 2016 I was assigned to a Criminal Enterprise/Violent Gangs squad in the Los Angeles Field Office, which conducted investigations into gang activity.  In that capacity, I primarily investigated violent street gangs who were often involved in narcotics violations, firearms violations, racketeering ("RICO"/"VICAR") offenses, and the conspiracies associated with those offenses, in violation of United States Code, Title 21, Sections 841, 846, 856, 860, and Title 18, Sections 922, 924, 1951, 1959, and 1962. From 2014 through 2015, I investigated human trafficking as part of criminal enterprise activities.

2.    I have received training and experience in the investigation of violations of state and federal human trafficking laws, including but not limited to the following.  I have directed and/or participated in several human trafficking and pimping/prostitution operations, conducted research into human trafficking and pimping/prostitution activity, discussed these topics with other experienced law enforcement officers, discussed the topic

with non-governmental organizations that conduct research and provide social services to prostitution and human trafficking victims, and interviewed numerous human trafficking and prostitution subjects and victims regarding the human trafficking and pimping/prostitution subcultures.

3. I was the affiant on the original search warrant for two Facebook social media accounts, as set forth below, which are the accounts I now seek 120 additional days to search.

4. I make this declaration in support of a request for an order permitting the government to retain and search, pursuant to the terms of the original warrant in this matter, for an additional 120 days, the following two Facebook social media accounts seized pursuant to the warrant described below (the "SUBJECT ACCOUNTS"):

a. SUBJECT ACCOUNT 1: the account associated with Facebook Profile ID 100002826572203, user name "young.marv.7", and

b. SUBJECT ACCOUNT 2: the account associated with Facebook Profile ID 100009456029740, user name "daddiemarv".

5. On April 5, 2016, I obtained a federal search warrant issued by the Honorable Alexander F. MacKinnon, United States Magistrate Judge, authorizing the search of the SUBJECT ACCOUNTS. The warrant, which is incorporated herein by reference and attached as Exhibit A, authorized the seizure and search of the SUBJECT ACCOUNTS to allow the government to search such devices for evidence of human trafficking violations.  The warrant authorized me to search the SUBJECT ACCOUNTS for 60 days, starting on the date on which I received Facebook's response to the warrant.

6. On or about April 5, 2016, I served the search warrant on Facebook.  On or about April 26, 2016, Facebook responded to the

1   warrant by notifying me that the results of the warrant were ready

2   for review.   On or about May 2, 2016, I downloaded the results from

3   the Facebook Law Enforcement Portal and began reviewing the results.

4        7.   The amount of information yielded by the original warrant

5   is significant.   There are more than 25,980 pages of content to

6   review, analyze, and organize.   I have completed reviewing just over

7   2,800 pages of content, and I do not anticipate being able to

8   complete the review and analysis of the remaining pages prior to the

9   expiration of the search authority in the warrant, which is June 24,

10  2016.

11       8.   This is the first request for an extension.

12       9.   In addition to the sheer size of the project of reviewing

13  the material contained in the SUBJECT ACCOUNTS, I have recently

14  encountered a health situation in my family that requires a

15  significant amount of my time and attention.   Specifically, my young

16  daughter was recently diagnosed with a serious illness that has

17  required hospitalization, surgeries, and many trips to doctors'

18  offices, as well as near-constant care.

19       10.  Upon the granting of the extension, I will continue to

20  review the documents to the extent that I am able.   I am hopeful that

21  I will be able to complete the review of the SUBJECT ACCOUNTS within

22  the next 120 days despite my daughter's medical situation.

23       11.  The original warrant ordered Facebook not to disclose the

24  existence of the warrant to the user of the SUBJECT ACCOUNTS, because

25  of the risk of the destruction or non-generation of evidence: namely,

26  the risk that the user of the SUBJECT ACCOUNTS would delete the

27  SUBJECT ACCOUNTS or stop using them if the user were to learn that

28  the FBI is searching his or her Facebook accounts for evidence of

1  criminal conduct.  The original warrant was not filed under seal, but

2  it was filed on the public docket in such a way that the specific

3  identities of the SUBJECT ACCOUNTS were not visible to the public.

4  To ensure that the contents of this warrant extension request are not

5  publicly filed, the government seeks authority to file this extension

6  request and all related documents under seal.

7      I declare under penalty of perjury under the laws of the United

8  States of America that the foregoing is true and correct and that

9  this declaration is executed at Los Angeles, California, on June 21,

10  2016.

11

12                 MICHAEL S. BROWN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

# EXHIBIT A

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No.
Two Subject Accounts, maintained at )
Facebook, Inc., 1601 Willow Road )
Menlo Park, CA 94025 )

## M 16 00697

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

     An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

    See Attachment A

    The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

    See Attachment B

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit is incorporated herein by reference.

    **YOU ARE COMMANDED** to execute this warrant on or before    14 days from the date of its issuance
                                                                         *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

    You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                    *(name)*

    IT IS FURTHER ORDERED that the Provider named in Attachment A shall comply with the further orders set forth in Attachment B, and shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

Date and time issued:   4/5/2016   10:33 am         **ALEXANDER F. MacKINNON**
                                                    *Judge's signature*

City and state:   Los Angeles, California           Alexander F. MacKinnon, U.S. Magistrate Judge
                                                     *Printed name and title*

AUSA:David M. Herzog 

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with SUBJECT ACCOUNTS 1 and 2, owned/used by the TARGET SUBJECT, that are stored at premises controlled by Facebook, Inc., which is a company that accepts service of legal process at 1601 Willow Road, Menlo Park, CA 94025.  The property to be searches consists of the following Facebook accounts:

a.   SUBJECT ACCOUNT 1: the account associated with Facebook Profile ID 100002826572203, user name "young.marv.7", and

b.   SUBJECT ACCOUNT 2: the account associated with Facebook Profile ID 100009456029740, user name "daddiemarv".

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I.   SEARCH PROCEDURE

1.   The search warrant will be presented to personnel of Facebook, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the agent who serves the search warrant.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  In conducting this search, the search team shall take notes regarding how it conducts the search.

i

5.    If the search team encounters immediately apparent
contraband or other evidence of a crime outside the scope of the
items to be seized, the team shall immediately discontinue its
search pending further order of the Court and shall make and
retain notes detailing how the contraband or other evidence of a
crime was encountered, including how it was immediately apparent
contraband or evidence of a crime.

6.    The search team will complete its search of the
content records as soon as is practicable but not to exceed 60
days from the date of receipt from the PROVIDER of the response
to this warrant.  If additional time is needed, the government
may seek an extension of this time period from the Court within
the original 60-day period.

7.    Once the search team has completed its review of the
content records and created copies of the items seized pursuant
to the warrant, the original production from the PROVIDER will
be sealed -- and preserved by the search team for authenticity
and chain of custody purposes -- until further order of the
Court.  Thereafter, the search team will not access the data
from the sealed original production which fell outside the scope
of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found
in this warrant govern only the search of digital data pursuant
to the authority conferred by this warrant and do not apply to
any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an
agent is not required for service or execution of this warrant.

II.  **INFORMATION ORDERED TO BE DISCLOSED TO THE GOVERNMENT BY THE PROVIDERS**

10.  To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNTS listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, including:

i.   All e-mails associated with the SUBJECT ACCOUNTS, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, and deleted e-mails, as well as all header information associated with each e-mail, and any related documents or attachments.

ii.   All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

iii.  All other records of communications and messages made or received by the user, including all private messages, deleted messages, chat history, video calling history, and pending "Friend" requests.

b.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a, including all log files,

dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

c.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, notes, texts, links, user profiles, account settings, access logs, and files.

d.   All photos and videos uploaded by the user of the account and all photos and videos uploaded by any user that have that user tagged in them.

e.   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

f.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked".

g.   All information about the Facebook pages that the account is or was a "fan" of.

h.   All past and present lists of friends created by the account.

iv

i.   All records of Facebook searches performed by the account.

j.   All information about the user's access and use of Facebook Marketplace.

k.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account.

l.   All subscriber information pertaining to the SUBJECT ACCOUNTS, including the date on which each account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), other account names or e-mail addresses associated with the account, telephone numbers, physical addresses, and other identifying information regarding the subscriber, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records.

## III. INFORMATION TO BE SEIZED BY THE GOVERNMENT

11.   For each of the SUBJECT ACCOUNTS listed in Attachment A, the search team may seize:

a.   All records and information described above in Section II.10.a through II.10.l.

b.   All other records and information from each of the SUBJECT ACCOUNTS that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1591,

Sex Trafficking by Force, Fraud, or Coercion; and § 1594(c)
Conspiracy to Engage in Sex Trafficking by Force, Fraud, or
Coercion; (TARGET OFFENSES) namely:

    i.   Information relating to who created,
accessed, or used the SUBJECT ACCOUNTS.

    ii.   Information relating to how, when, and where
the SUBJECT ACCOUNTS were accessed.

    iii. Information related to the identities of
TARGET SUBJECT, co-conspirators, and victims, including true and
false names, nicknames and monikers, internet usernames,
biographical information, phone numbers, addresses, vehicles,
images, and videos.

    iv.  All forms of communications between TARGET
SUBJECT, co-conspirators, and victims, including public and
private messages, posts, comments, likes, shares, tags, and
pokes.

    v.   Information related to TARGET SUBJECT's and
co-conspirator's membership in, participation in, or affiliation
with a street gang or other criminal enterprise.

    vi.  Information related to the distribution,
transportation, sale, possession, or use of controlled
substances and alcohol.

    vii. Information related to TARGET SUBJECT's
possession and use of firearms, knives, or other weapons.

    viii.   Information related to TARGET SUBJECT's
possession and use of tattoos and brands.

ix. Information related to TARGET SUBJECT's and co-conspirator's use of profane and vulgar language regarding victims, as well as indications of TARGET SUBJECT's and co-conspirator's use of violence, and threats of violence.

x. Information related to TARGET SUBJECT's financial or other valuable gain from possession of large sums of U.S. and foreign currency, precious metals and gems, jewelry, watches, designer clothing and accessories, luxury vehicles, artwork, high end electronics and gaming systems, other expensive items, real estate, business, and, entrepreneurial ventures.

xi. Information related to the pimp and prostitution lifestyle and subculture or luxurious/glamorous lifestyle.

xii. Information related to the discussion or depiction of any commercial sex acts, in-calls, out-calls, or tracks.

xiii. Information related to lingerie, condoms, sexual lubricants, and sex toys.

xiv. Information related to the methods and locations of travel and lodging of TARGET SUBJECT, co-conspirators, and victims.

xv. References to backpage.com, craigslist.com, and any sexually explicit or adult escort related website.

xvi. Information related to TARGET SUBJECT's and co-conspirator's use of force, fraud, or coercion to recruit,

obtain, maintain, entice, control, transport, or provide a person for commercial sex acts.

           xvii.     Information related to the benefits or items of value gained by the TARGET SUBJECT and co-conspirators from the commercial sex acts of another person.

## IV.  PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall provide the results in electronic/digital format and send such information to:

> Los Angeles FBI
> Attn: Special Agent Michael Brown
> 11000 Wilshire Blvd, 13th Floor
> Los Angeles, CA 90024
> (310) 996-3698
> michael.brown5@ic.fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant and complete and return the "Declaration of Custodian Certifying Business Record" form which will be provided to the PROVIDER with this warrant.

14.  IT IS FURTHER ORDERED that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

## AFFIDAVIT

I, Michael S. Brown, being duly sworn, declare and state as
follows:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been so employed since October
2006.  Since February 2016, I have been assigned to a Civil
Rights squad at the Los Angeles Field Office of the FBI, which
conducts investigations into Human Trafficking activity.  I am
primarily assigned to conduct investigations of sex and labor
trafficking by means of force, fraud, or coercion, as well as
the conspiracies associated with these offenses, in violation of
United States Code, Title 18, Sections 1589, 1590, 1591, 1592,
1593, 1594, and 2421.  From 2007 to 2016 I was assigned to a
Criminal Enterprise/Violent Gangs squad in the Los Angeles Field
Office, which conducted investigations into gang activity.  In
that capacity, I primarily investigated violent street gangs who
were often involved in narcotics violations, firearms
violations, racketeering ("RICO"/"VICAR") offenses, and the
conspiracies associated with those offenses, in violation of
United States Code, Title 21, Sections 841, 846, 856, 860, and
Title 18, Sections 922, 924, 1951, 1959, and 1962.  From 2014
through 2015, I investigated human trafficking as part of
criminal enterprise activities.

2.    I have received training and experience in the
investigation of violations of state and federal human
trafficking laws, including but not limited to the following.  I

have directed and/or participated in several human trafficking and pimping/prostitution operations, conducted research into human trafficking and pimping/prostitution activity, discussed these topics with other experienced law enforcement officers, discussed the topic with non-governmental organizations that conduct research and provide social services to prostitution and human trafficking victims, and interviewed numerous human trafficking and prostitution subjects and victims regarding the human trafficking and pimping/prostitution subcultures.

## II.   PURPOSE OF AFFIDAVIT

3.   I make this affidavit in support of an application for a search warrant for information associated with the accounts identified in Attachment A (the "SUBJECT ACCOUNTS") that are stored at the premises controlled by Facebook, Inc. ("Facebook" or the "PROVIDER"), which is a provider of electronic communication and remote computing services that accepts legal process at, and is headquartered at, 1601 Willow Road, Menlo Park, CA 94025.[1]   The information to be searched is described in

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in
*(footnote cont'd on next page)*

this affidavit and in Attachment B.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

4.    As described more fully below, I submit that there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 1591, Sex Trafficking by Force, Fraud, or Coercion; and § 1594(c), Conspiracy to Engage in Sex Trafficking by Force, Fraud, or Coercion (the "TARGET OFFENSES").

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from a cooperating victim.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

---

which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF INVESTIGATION

6. On or about March 14, 2016, an individual ("Victim-1") contacted the FBI regarding potential human trafficking activity being conducted by MARVIN RIVERS, date of birth 06/20/1981, also known as ("aka") "YOUNG MARV," aka "MADD HUSTLE" ("RIVERS" or the "TARGET SUBJECT"). Victim-1 reported that RIVERS was a pimp and Victim-1 had previously worked as a prostitute at RIVERS' direction for a few years until an occasion in 2013 when RIVERS broke Victim-1's ribs and fingers in 2013. At that time, Victim-1 fled and was recovered by her family. According to Victim-1, RIVERS transported his sex workers to locations for commercial sex acts and maintained a website to advertise them for commercial sex acts. Victim-1 reported that during the past few years, RIVERS has continued to "stalk" Victim-1 and attempted to cause Victim-1 to return to working as a prostitute for RIVERS. Victim-1 has refused. In March 2016, RIVERS arrived at Victim-1's residence in the Los Angeles, California, area, damaged her vehicle, and threatened to harm Victim-1. I have confirmed that information on RIVERS' publicly-available Facebook page is consistent with the statements given by Victim-1, including his identity and references to human trafficking conduct. I seek a search warrant so that I may access RIVERS' entire Facebook account, including the portions that are not

4

publicly available, because I believe there is probable cause

that information on RIVERS' Facebook page will contain evidence

of his human trafficking conduct.

## IV.   Interviews with Victim-1

7.   On or about March 21 and 24, 2016, I interviewed

Victim-1 regarding RIVERS and his human trafficking activity.

Victim-1 told me the following.

a.   Victim-1 met RIVERS in San Diego, California, and

worked for RIVERS as a sex worker in San Diego, and Los Angeles,

California, and in Las Vegas, Nevada.  When Victim-1 first met

RIVERS, he enticed her by promising her a glamorous lifestyle,

but RIVERS never followed through on that promise.  Instead,

Victim-1 worked daily as a sex worker on the streets and in

motels and had to turn over all of her proceeds to RIVERS.

b.   When Victim-1 was not in the immediate presence

of RIVERS, RIVERS would maintain contact with Victim-1 via cell

phone conversations and text messages.  After commercial sex

acts, Victim-1 would have to report directly to RIVERS to

provide him with the proceeds, even before cleaning herself up.

c.   Victim-1 and other sex workers who worked for

RIVERS lived in RIVERS' apartment with him when they were not in

motels.  RIVERS provided his sex workers with the basics of

shelter, food, minimal clothing, toiletries, and cell phones.

d.   RIVERS prevented Victim-1 from attending school

or associating with her friends and family.

5

   e. RIVERS physically assaulted Victim-1 multiple times and prevented VICTIM-1 from obtaining medical attention.

   f. RIVERS kept control of Victim-1's driver's license and birth certificate.

   g. RIVERS caused Victim-1 to be branded with a tattoo on her neck.  The tattoo reads "Young Marv," which is one of RIVERS' monikers.  RIVERS also caused Victim-1 to be branded with a large tattoo covering her lower back that reads "Young Marv," with an image of a crown above it.  From my training and experience in sexual exploitation cases, I believe that the combination of "Young Marv" and the image of a crown tattooed on Victim-1 represent RIVERS' "brand" and indicate his ownership/possession of Victim-1.

   h. RIVERS used his two pit bull dogs to intimidate Victim-1 and to ensure that she did not leave RIVERS' residence.

   i. RIVERS used prostitution-related advertisements on the websites Craigslist.com and Backpage.com.  When a commercial sex act had been arranged, RIVERS would transport the sex workers to the locations at which the commercial sex act would take place.

   j. Victim-1 saw RIVERS assault other sex workers, including an occasion on which RIVERS "broke [the] face" of another sex worker, to such a degree that the victim of the assault now has a metal plate in her face.

   k. RIVERS is a black male and has tattoos on his arms that read "Young Marv" and "Madd Hustle."

l.    RIVERS possessed two handguns and is a member of a Crips gang in San Diego.

m.    RIVERS uses two Facebook accounts, one under the name "Madd Hustle" or "Young Marv" and the other under the name "Daddie Marv."  I know from my training and experience in sexual exploitation cases that reference to "daddy" often indicate a pimp/prostitute relationship.

## V.    Victim-1's Identification of RIVERS

8.    I showed Victim-1 a number of photographs that she was able to identify, including the following.

a.    I showed Victim-1 a single photograph I obtained from the California Department of Motor Vehicles, which was the driver's license photograph of MARVIN GENE RIVERS, license #D2009259, date of birth 06/20/1981.  Victim-1 identified the person in the photograph as RIVERS.

b.    I showed Victim-1 a single profile photograph obtained from the public Facebook.com webpage for "Madd Hustle" aka "Young Marv."  Victim-1 identified the person in the photograph as RIVERS.

c.    I showed Victim-1 two photographs of a tattoo depicting "Young Marv" with an image of a crown over it, obtained from the public Facebook.com webpage for "Madd Hustle" aka "Young Marv."  Victim-1 identified the photograph of the tattoo as a picture of the tattoo on her own lower back.

d.    I showed Victim-1 three photographs of a black male holding a pistol, obtained from the public Facebook.com

webpage for "Madd Hustle" aka "Young Marv."  Victim-1 identified
the person in the photographs as RIVERS, and identified the room
in which RIVERS was holding the handgun as the bedroom of his
apartment.

## VI.   STATEMENT OF PROBABLE CAUSE

9.    On or about March 24, 2016, I reviewed the publicly
available Facebook.com webpage identified by Victim-1 as one of
the accounts used by MARVIN RIVERS, under the user name
"young.marv.7", the screen name "Madd Hustle", and the Profile
ID 100002826572203 ("SUBJECT ACCOUNT 1").  In SUBJECT ACCOUNT 1
I observed posts, pictures, and comments indicating that RIVERS
is the owner/user of the account as well as information
consistent with RIVERS being engaged in pimping and
prostitution, including but not limited to the following.

a.    The profile picture identified by Victim-1 as
RIVERS was posted in SUBJECT ACCOUNT 1 next to the user name
"YoungMarv" and the screen name "Madd Hustle."

b.    SUBJECT ACCOUNT 1 includes a photograph of RIVERS
displaying identifiable Crip gang hand signs, with which I am
familiar based on my training and experience as a gang
investigator.

c.    SUBJECT ACCOUNT 1 includes the prostitution-
related term "out-calls," with which I am familiar based on my
training and experience as a sexual exploitation investigator,
as set forth below.

d.   SUBJECT ACCOUNT 1 includes a photograph of RIVERS displaying a tattoo on his forearm that reads "Young Marv."

e.   SUBJECT ACCOUNT 1 includes photographs previously identified by Victim-1 as RIVERS displaying a handgun.

f.   SUBJECT ACCOUNT 1 includes photographs of the tattoo identified by Victim-1 as the tattoo she has on her lower back, which RIVERS caused her to obtain; the tattoo includes RIVERS' moniker "Young Marv."

g.   SUBJECT ACCOUNT 1 includes photographs consistent with the pimping and prostitution "Game," with which I am familiar based on my training and experience as a sexual exploitation investigator, as set forth below.  These photographs include images of electronics equipment and computers, marijuana and alcohol, luxury vehicles, and RIVERS displaying large sums of cash.

10.   On or about March 29, 2016, I reviewed the publicly available Facebook.com webpage identified by Victim-1 as another Facebook account used by MARVIN RIVERS, under the user name "daddiemarv", the screen name "Madd Hustle", and the Profile ID 100009456029740 ("SUBJECT ACCOUNT 2").  In SUBJECT ACCOUNT 2 I observed posts, pictures, and comments indicating that RIVERS is the owner/user of the account as well as information consistent with RIVERS being engaged in pimping and prostitution, including but not limited to the following.

a.   SUBJECT ACCOUNT 2 includes a profile picture depicting the tattoo on Victim-1's lower back posted next to the user name "MaddHustle" and the screen name "Daddie Marv."

9

     b.    SUBJECT ACCOUNT 2 includes an image stating "time to make a pimp decision" and a photograph of Victim-1's lower back tattoo containing RIVERS' moniker with the comment "my bitch lower back."

11.   Additionally, I reviewed RIVERS's Department of Motor Vehicles driver' license photograph, which Victim-1 identified as a photograph of RIVERS.  The person depicted in RIVERS' driver's license photograph appears to be the same person depicted as the owner/user of the SUBJECT ACCOUNTS.

12.   Based on these facts and circumstances, I submit there is probable cause to believe that RIVERS has been engaged in human trafficking activity and that he currently uses Facebook.com in association with and in furtherance of his human trafficking activity.

13.   On or about March 23 and 29, 2016, I submitted a preservation request through the Facebook Online Law Enforcement Request System, requesting that information associated with the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

14.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNTS by other means.

## V.   KNOWLEDGE OF HUMAN TRAFFICKING ACTIVITY

15.   Based on my training and experience, as well as the training and experience of other investigators with whom I have consulted, I know the following.

    a.    People engaged in human trafficking routinely attempt to conceal their identities, as well as the locations at which their crimes take place. These people often have vehicles, properties, telephones, utilities, social media accounts, and other items purchased and registered in fictitious name or monikers, and/or in the names of others, in order to conceal the association of criminal activities with their true identities and financial transactions.

    b.    People engaged in human trafficking often use coded language to disguise their criminal activities when communicating with fellow members/associates of their criminal enterprises and with other persons with whom they conduct illicit business. These individuals often communicate in person, via telephone conversation, via text, chat, e-mail, instant messaging, social media websites, and other forms of electronic and internet based messaging, and by using various forms of written correspondence. Their communications commonly discuss co-conspirators, victims, witnesses, and the criminal activities themselves.

    c.    People engaged in human trafficking are often associated with criminal street gangs and other criminal enterprises. Their membership or association with a gang or other criminal enterprise can be used to control and intimidate victims and witnesses, as well as to facilitate the human trafficking activities themselves.

    d.    People engaged in gang activity and/or holding gang membership often identify their membership and/or status in

a respective gang through hand signs, paraphernalia (such as bandanas, certain clothing styles, brands of apparel, sports team attire, and certain colors associated with their gangs), drawings, photos, tattoos, graffiti depicting the gang's signs and symbols, gang members' names, initials, logos, monikers, slogans, and specific references to street gang membership, affiliation, activity, and identity, as well as items and markings that show a disrespect for rival gangs.

e.    Individuals who, through force, intimidation, fraud, enticement, and/or coercion, enlist other individuals to become prostitutes and engage in commercial sex acts, and who profit from the prostitution of others, are human traffickers. They are often called "pimps."  Pimps generally attempt to maintain groups of girls/women who work as prostitutes for them; collectively, such a group of women or girls is said to be in a given pimp's "stable."  The sexual exploitation of individuals in the sex industry is commonly referred to as "The Life" or "The Game."  It is common for a pimps to convey to victims and criminal associates their status as pimps, in which they boast about lavish lifestyles (although those lifestyles are often illusory).  Pimps often flaunt new and expensive clothing, jewelry, cars, phones, furniture, televisions and gaming systems, food and alcohol, entertainment, travel, large sums of cash, drugs, guns, tattoos, and other items of interest and value to their victims and criminal associates.  It is common for pimps to boast about their status as pimps and to exhibit lavish lifestyles in person, in phone conversations and text

messages, and over the internet through various social media websites (such as Facebook.com and Instagram.com), as well as through other means of online communications.  Additionally, pimps generally do not maintain legitimate employment; their wealth, apparent wealth, and lavish lifestyles are generally inexplicable through traditional or legitimate employment.  From my training and experience, I know that pimps often obtain and maintain their income via a variety of illicit means, primarily the proceeds obtained from their victims performing commercial sex acts and giving the proceeds to them.

     f.   Pimps often locate, identify, entice, coerce, recruit, and/or force their victims into the prostitution lifestyle through several methods.  The act of being recruited into the prostitution lifestyle and successfully being caused to conduct commercial sex acts as a prostitute for a pimp is referred to as being "turned-out."  Pimps may use one or a combination of methods to "turn-out" a victim.

     g.   One common method of enticing a victim into The Life ("Romeo pimping") involves a pimp initiating a pseudo-romantic relationship in which the pimp will coerce and/or entice the victim into a romantic or boyfriend/girlfriend relationship with them pimp.  Once the victim believes the pimp likes him or her and will care for him or her, the pimp will usually have sex with the victim.  This sex act may be consensual (although if the sex is with a victim under the legal age of consent and the pimp is an adult the sex act often constitutes the sexual abuse of a minor) or may be a violent

13

rape.  After the pimp has had sex with the victim, the pimp will explain to the victim that he or she needs to prostitute for the pimp so that the "couple" has financial security or the ability to purchase desired objects and commodities.

      h.  Another common method of enticing a victim into The Life ("sugar daddy pimping") involves the pimp giving a victim false hope for a chance at a better life and/or job opportunities.  Through fraud and deceit the pimp may lure a victim into a friendly consensual encounter or even multiple encounters under the guise that the pimp will care and provide for him or her or will obtain employment for the victim.  The pimp will later change his demeanor and explain to the victim that he or she is actually going to serve as a prostitute for the pimp and the pimp may ultimately assault, intimidate, threaten, rape, or torture the victim until he or she submits and ultimately prostitutes for the pimp.

      i.  Another common method of recruiting and maintaining victims in The Life ("gorilla pimping") involves a pimp using kidnap, rape, torture, physical force, physical abuse, verbal abuse, psychological abuse, threats and intimidation, the display and use of firearms and other weapons, the use of narcotics and alcohol to intoxicate and addict the victim, and assaults of other prostitutes in front of a victim. Pimps who engage in violence as means to obtain and maintain prostitutes are referred to as "gorilla pimps."

      j.  When a victim is "turned-out," it is common for the victim to experience a dynamic with his or her pimp that is

14

similar to the cycle of domestic violence and/or Stockholm
syndrome that victims experience with their victimizers.  Some
victims can grow accustomed to the lifestyle and form attachment
with and dependency on their pimps, while others may feel
trapped or helpless to escape.  A victim is said to be "in-
pocket" when he or she remains faithful to his or her pimp
and/or follows the rules of The Game.  In contrast, the term
"out-of-pocket" refers to a prostitute who is unfaithful to his
or her pimp, whether by looking at and/or talking to another
pimp or by actually working as a prostitute for another pimp
(referred to as "choosing up").  Other forms of being out-of-
pocket include not obeying a pimp, not providing a pimp with
sufficient proceeds, or otherwise breaking the rules set by the
pimp.

       k.   Pimps often seek to dominate, control, and
manipulate their victims, and do so through a range of methods
involving force, fraud, and/or coercion, including charm and
charisma, the allure of a glamorous lifestyle, deception and
false promises, drugs and alcohol, verbal threats, physical
force, use of weapons, and brutal physical and sexual assaults
or torture.  Pimps consider victims to be their property and
believe that victims should be submissive and subservient to
their pimps.  Pimps want their victims to need and depend on
them for survival or become infatuated and obsessed with them,
in order to maintain power and control over the victims.  Pimps
view their victims as sources of income, business commodities,
and as objects that are disposable and replaceable.

1.    In obtaining prostitutes, pimps often look for people who have low self-esteem, have suffered prior abuse or neglect, have alcohol or substance abuse issues, and/or who are seeking companionship, a glamorous lifestyle, a source of income, or the feeling of being needed/wanted.  Some victims are simply trying to survive.  Ultimately, victims are people whom pimps can control.

m.    Pimps often "brand" their victims by having the victim tattooed with the pimp's name, gang moniker, or some other symbol that represents the pimp, in order to identify the victim as the pimp's personal property.

n.    Some juveniles are brought into the prostitution lifestyle as early as age 12-14.  Juvenile prostitutes are commonly runaways/"throwaways" and/or come from troubled homes and foster homes.  Juveniles have also been recruited from schools, gangs, and the Internet.  Many juveniles involved in prostitution have pimps who are able to engage in certain activities, such as booking hotel/motel rooms, that a minor may not be able to do on his or her own.  Many juveniles are lured into the lifestyle or initially begin consensual, romantic, dating relationships with pimps, who then turn the victims into prostitutes.  Individuals who pimp minor victims sometimes produce, collect, and/or possess digital images/videos of those victims in the form of child pornography.

o.    The most prevalent methodology of pimps to employ their victims as prostitutes are (1) through street prostitution along portions of streets commonly known for high volume

prostitution activity, referred to as "the track" or "the blade"; (2) appointments made with or for the victim to engage in commercial sex acts at a hotel/motel, referred to as "in-calls" or at a location identified by a customer, referred to as "out-calls"; and (3) posting advertisements for "escort" and "massage" services online (such as Backpage.com, Escortads.xxx, Escortprofiles.xxx, Wizads.com, and Bodyrublist.com). Several known "tracks" exist in and around the Los Angeles area, including Figueroa Street and Western Avenue in South Los Angeles, Sepulveda Boulevard in the San Fernando Valley, and Long Beach Boulevard in Compton. Additionally, the cities of Palmdale, Long Beach, Pomona, and Anaheim are other locations in the Los Angeles area for prostitution/human trafficking activity. Pimps commonly require victims to work long hours in austere conditions and perform commercial sex acts with complete strangers, who may be diseased or violent, at any time the pimp commands.

     p.   The term "daddy" is commonly used by prostitutes when referring to their pimps. Pimps' cellular telephone numbers are often programmed as "daddy" in prostitute's cellular telephones. Pimps frequently refer to prostitutes as "bitches" and/or "hoes." The term "folks/family" also refers to the pimp that a victim works for and other prostitutes in "the stable." Pimps often have a high turnover rate of prostitutes and, generally, seek to increase the size of their "stables." The term "date" is street vernacular for a prostitute engaging in a

commercial sex act with a paying customer, who is usually referred to as a "trick" or a "john."

q.     Pimps generally receive the proceeds that victims earn by performing commercial sex acts.  It is common for pimps to wait nearby while victims perform commercial sex acts in order to provide "protection" for the victims in case customers become violent or refuse to pay for the sexual services.  Many victims are required to return to the pimp after each "date" in order to provide the pimp with their proceeds.

r.     Pimps facilitate prostitution by transporting and/or causing the transportation of the prostitutes to locations where the prostitution occurs, such as "the tracks" and motels/hotels.  The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.  Prostitutes and/or pimps often stay in motels/hotels for the purposes of conducting prostitution activities locally and when they travel.  The pimps use the proceeds earned during acts of prostitution to purchase food, lodging, clothing, and other items for themselves and their prostitutes.  Many pimps work with co-conspirators, who are referred to as "pimp partners" who may assist each other in facilitating prostitution or otherwise managing the prostitutes.

s.     Pimps and prostitutes often maintain records linking them to their trafficking activities.  These records may include but are not limited to the identities and other information about co-conspirators and other criminal associates; the identities and other information about prostitution

customers; identities and other information about the victims of human trafficking and sexual exploitation; prices (often referred to as "donations") charged for commercial sex acts; rules and regulations for the prostitutes to follow; methods of and locations where victims have been recruited, enticed, coerced, obtained, harbored, maintained, transported, advertised, and sold for commercial sex acts; and expenses incurred by the traffickers associated with trafficking activities, including the costs for transportation, food, clothing, shelter, condoms, phones, advertisement, hotel/motel rooms, and other related expenses. These records/documents often include receipts of wire transfer transactions; banking/ATM receipts; shipping receipts from postal and shipping businesses; credit card statements; restaurant, hotel/motel, and shopping receipts; telephone records; address books which identify victims, customers, and/or co-conspirators; ledgers; calendars; notes; various forms of written communication including text messages, instant messages, and e-mails; and photographs or videos of victims and co-conspirators. Even if off-site locations are used to store the above records, some evidence such as safety deposit keys, padlock keys, combinations or pass codes, records, and receipts and/or documents regarding multi-warehouses, storage facilities, mail and answering services may be present. These and other similar records not only provide information about or support the crime itself, but also tend to show where and when the activity has occurred.

These and other similar records are commonly located on computers, cell phones, and other digital devices.

   t. Pimps and prostitutes attempt to avoid detection by law enforcement through the perceived anonymity provided by the Internet and have embraced the Internet as a means of advertising for services and communicating with each other, as well as with prostitution customers. Because some cellular telephones, known as "smart phones," provide high-speed access to the Internet as well as photograph/video capabilities, pimps use their cellular telephones for many of the same purposes for which they would use computers, including recruiting prostitutes on social media websites, taking photographs of their prostitute(s) for online prostitution advertisements, uploading/posting prostitution advertisements on the Internet, and taking photographs or videos to memorialize sexual activity with their prostitute(s), among other purposes.

   u. Prostitution-related advertisements on websites commonly include photographs that depict nude or semi-nude females. These females are, at times, under the age of 18 years old. Online advertisements for prostitution often contain codes for the services provided. For example, the term "in-calls only" means the customer will respond to a location provided by the prostitute for the sexual transaction, and the term "donation" is often used to mean the cost for the sexual transaction. "GFE" is used to refer to the prostitute providing a girlfriend experience to the customer.

## VI.  <u>BACKGROUND REGARDING THE PROVIDER ("FACEBOOK")</u>

16.  Based on my training and experience and my
conversations with other law enforcement officers, I know that
criminals who subscribe to social media sites sometimes use
those sites to continue illegal or illicit activities.  These
criminals sometimes use sites such as Facebook for communicating
and continuing their illegal enterprise because they think that
such messages will be harder for law enforcement officers to
monitor.

17.  Facebook owns and operates a free-access social
networking website of the same name that can be accessed at
http://www.facebook.com.  The Facebook website allows its users
to establish accounts with Facebook, and users can then use
their accounts to "post" or share written news, photographs,
videos, commentary, and other information with other Facebook
users, and sometimes with the general public.

18.  Facebook asks users to provide basic contact
information to Facebook, either during the registration process
or thereafter.  This information may include the user's full
name, birth date, contact e-mail addresses, physical address
(including city, state, and zip code), telephone numbers, screen
names, websites, and other personal identifiers.  Facebook also
assigns a profile identification number to each account.

19.  Facebook users can select different levels of privacy
for the communications and information associated with their
Facebook accounts.  By adjusting these privacy settings, a
Facebook user can make information available/visible only to

21

himself or herself, to particular Facebook users, to all
Facebook users, or to anyone with access to the Internet,
including people who are not Facebook users. Facebook accounts
also include other account settings that users can adjust to
control, for example, the types of notifications they receive
from Facebook.

20.  Facebook users may join one or more groups or networks
to connect and interact with other users who are members of the
same group or network. A Facebook user can also connect
directly with individual Facebook users by sending each user a
"Friend Request." If the recipient of a "Friend Request"
accepts the request, then the two users will become "Friends"
for purposes of Facebook and can exchange communications or view
information about each other. Each Facebook user's account
includes a list of that user's "Friends" and a "Timeline" or
"Mini-Feed," which highlights information about the user's
posted activity, their "Friends," photographs, commentary, and
other information such as profile changes, and upcoming events.

21.  Facebook users can create profiles that include
photographs, lists of personal interests, and other information.
Facebook users can also post "status" updates about their
whereabouts and actions, as well as links to videos,
photographs, articles, and other items available elsewhere on
the Internet. Facebook users can also post information about
upcoming "events," such as social occasions, by listing the
event's time, location, host, and guest list. A particular
user's profile page also includes a "Wall," which is a space

22

where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

22.    Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

23.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

24.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a

23

personalized message can be attached to each gift.  Facebook
users can also send each other "pokes," which are free and
simply result in a notification to the recipient that he or she
has been "poked" by the sender.

26.  Facebook also has a Marketplace feature, which allows
users to post free classified ads.  Users can post items for
sale, housing, jobs, and other items on the Marketplace.

27.  In addition to the applications described above,
Facebook also provides its users with access to thousands of
other applications on the Facebook platform.  When a Facebook
user accesses or uses one of these applications, an update about
that the user's access or use of that application may appear on
the user's profile page or account.

28.  Some Facebook pages are affiliated with groups of
users, rather than one individual user.  Membership in the group
is monitored and regulated by the administrator or head of the
group, who can invite new members and reject or accept requests
by users to enter.  Facebook can identify all users who are
currently registered to a particular group and can identify the
administrator and/or creator of the group.  Facebook also
assigns a group identification number to each group.  Facebook
uses the term "Group Contact Info" to describe the contact
information for the group's creator and/or administrator, as
well as a PDF of the current status of the group profile page.

29.  Facebook uses the term "Neoprint" to describe an
expanded view of a given user profile account.  The "Neoprint"
for a given user can include the following information from the

user's profile: profile contact information; timeline; mini-
feed information; status updates; links to videos, photographs,
articles, and other items; notes; wall postings; friend lists,
including the friends' Facebook user identification numbers;
groups and networks of which the user is a member, including the
groups' Facebook group identification numbers; future and past
event postings; rejected "Friend" requests; comments; gifts;
pokes; tags; and information about the user's access and use of
Facebook applications.

30. Facebook also retains Internet Protocol ("IP") logs
for a given user ID or IP address. These logs may contain
information about the actions taken by the user ID or IP address
on Facebook, including information about the type of action, the
date and time of the action, and the user ID and IP address
associated with the action. For example, if a user views a
Facebook profile, that user's IP log would reflect the fact that
the user viewed the profile, and would show when and from what
IP address the user did so.

31. Social networking providers like Facebook typically
retain additional information about their users' accounts, such
as information about the length of service (including start
date), the types of service utilized, and the means and source
of any payments associated with the service (including any
credit card or bank account number). In some cases, Facebook
users may communicate directly with Facebook about issues
relating to their account, such as technical problems, billing
inquiries, or complaints from other users. Social networking

providers like Facebook typically retain records about such
communications, including records of contacts between the user
and the provider's support services, as well records of any
actions taken by the provider or user as a result of the
communications.

32.   Therefore, the computers/servers of Facebook are
likely to contain all the material just described, including
stored electronic communications and information concerning
subscribers and their use of Facebook, such as account access
information, transaction information, and account application.

33.   I know from my training and experience that the
ability to access the complete contents of electronic
communications accounts may be important to establishing the
identity of an actual user who has dominion and control of an
account at a given time.  Accounts may be registered in false
names or screen names from anywhere in the world with little to
no verification by the service provider.  They may also be used
by multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a SUBJECT
ACCOUNT.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search for information

26

showing the actual user of the account would, in some instances, prevent the government from identifying the user of the account and, in other instances, prevent a defendant from suggesting that someone else was responsible. Therefore, the content of a given account, including the accounts that send messages to a given SUBJECT ACCOUNT, often provides important evidence regarding the actual user's dominion and control of an account. For the purpose of searching for communications content demonstrating the actual user of SUBJECT ACCOUNTS 1 and 2, I am requesting a warrant requiring the PROVIDER to turn over all of the contents of the accounts without a date restriction for review by the search team.

34. Relatedly, the government must be allowed to determine whether other individuals had access to the account. If the government were constrained to review only a small subsection of an account's contents, that small subsection might give the misleading impression that only a single user had access to the account.

35. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as lol to express "laugh out loud"), or codewords (which require entire strings or series of e-mail conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea

27

such as a happy face inserted into the content of an e-mail or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an e-mail account by law enforcement personnel with information regarding the identified criminal activity, subject to certain protocols, is necessary to find all relevant evidence within the account.

36.  As set forth in the search protocol below in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER under seal until the investigation is completed and, if a case is brought, until that case is completed through disposition, trial, appeal, or collateral proceeding.

37.  I make that request because I believe it might be impossible for the PROVIDER to authenticate information taken from the account as its business record without the original production to examine. Even if the PROVIDER kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the PROVIDER to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the PROVIDER to examine a particular document found by the search team and confirm that it was a business record of the PROVIDER's taken from one of the SUBJECT ACCOUNTS.

38.  I also know from my training and experience that many
e-mail accounts are purged as part of the ordinary course of
business by Internet Service Providers ("ISPs").  For example,
if an e-mail account is not accessed within a specified time
period, it -- and its contents -- will be deleted.  As a
consequence, there is a risk that the only record of the
contents of an e-mail account might be the production that an
ISP makes to the government if, for example, a defendant is
incarcerated and does not (perhaps cannot) access his or her
account.  Preserving evidence would, therefore, ensure that the
government can satisfy its Brady obligations and give the
defendant access to evidence that might be used in his or her
defense.

## VII.  REQUEST FOR NON-DISCLOSURE

42.  Pursuant to 18 U.S.C. § 2705(b), I request that the
Court enter an order commanding the PROVIDER not to notify any
person, including the subscriber(s) of the SUBJECT ACCOUNTS, of
the existence of the warrant because there is reason to believe
that such notification will result in: (1) endangering the life
or physical safety of an individual; (2) destruction of or
tampering with evidence; (3) intimidation of potential
witnesses; or (4) otherwise seriously jeopardizing the
investigation.  For example, if the PROVIDER or other persons
notify the targets of the investigation that a warrant has been
issued for the SUBJECT ACCOUNTS, the targets may alter or delete
content from the accounts, or notify others to alter or delete

29

the accounts on their behalf.  Targets may discontinue use of
the accounts or modify their criminal tactics to deceive or
avoid detection by law enforcement.  Targets may further notify
other individuals to alter or delete the contents of their
accounts or cease the use of affiliated accounts which may
become relevant to determining who was in contact with the
SUBJECT ACCOUNTS and the activity of co-conspirators.  These and
other actions may in turn hinder or obstruct law enforcement's
ability to determine the scope of any ongoing criminal
activities by subjects of investigation, their criminal
associates, and/or co-conspirators.

### VIII.   CONCLUSION

43.   The facts stated in the foregoing affidavit are true
and correct to the best of my knowledge, information, and belief
and I request that the proposed warrant be issued.

/s/
Michael S. Brown
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
on this 5th day of April, 2016.

ALEXANDER F. MacKINNON
HON. ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE